Good morning, Your Honors. May it please the Court, I'm Shane Pennington. I represent the petitioners in this case, and I'd like to reserve five minutes for rebuttal, if that's all right. I'll begin today by addressing the Court's request regarding final agency action in this case. As the Court knows, the final agency action standard was articulated by the Supreme Court in Bennett v. Speer. There are two prongs. The first is whether the agency decision under review is the embodiment of the consummation of the agency's decision-making process. And that's in contrast to whether it's merely tentative or interlocutory in nature. In the prior round of litigation in this case, the sort of Ames I, as I'll call it, where this Court held that a letter responding to a request for advice and assistance from DEA was not final agency action, under the first Bennett prong, the Court said, look, this letter is not the consummation of any decision-making process because no decision-making process had begun. That conclusion from the Court was based on the fact that petitioners in the letter to DEA that prompted the non-final response from DEA had not asked for any waiver or exemption or change to the agency's regulations or any formal decision from the agency. As a result, all they asked for was advice and assistance. What asked — there are two issues here that were asked of the agency. One was some — they wanted some general statement that the RTT, the Right to Try Act, applied and they could go and give his patients this drug. And then secondly, they wanted a specific exemption. So leave that part out. As to the first part, what was being asked of the agency? In the first round of litigation, Your Honor? Oh, in this round of litigation. In this round, there were two requests or — That's what I just said. There were two requests. Right. I'm not sure that I'm understanding your question. What were you asking the agency to do with regard to some declaration of whether the RTT was an exemption from the Controlled Substances Act? You were just asking for their legal opinion, basically. No, Your Honor. We asked the agency to make two decisions. First, an individualized exception or finding that my client could obtain access to psilocybin, a qualifying investigational drug under the Right to Try Act, for this therapeutic use under State and Federal law. As a legal matter, because — I mean, you weren't asking the agency to do anything. You were just asking them to say it's okay. Right, Your Honor. And there's a reason for that. Because in order to get the drug, to be able to provide it to these terminally ill patients in this urgent situation, the drug sponsors, the manufacturers, the ones who are the source of the drug, who have to agree to provide it, are going — they did want, in the record — sorry, Your Honor. What the — as to that first question, not the second issue about whether you would get a waiver for registration and so on, but as to that first request, which is just tell us it's okay. Was that the request, tell us it's okay? No, Your Honor. It was to do what the agency has done in the past, which is to make an individualized accommodation for access to a Schedule I drug outside of the research context for therapeutic use. But I thought that's the second request. The first request here was just tell us it's okay. Not don't make a rule, don't do a formal exception, just tell us it's okay. In a sense. I mean, functionally, Your Honor, that's true. Right? Functionally, we just needed to have evidence that it was okay so that we could get — So you're just asking for the agency's legal opinion. And what — leave aside even the first part of Bennett. What legal impact does that have? It has none. If you then want to go — if, for example, you went ahead and did it and got prosecuted, the fact of what the agency said would be no, never mind, it wouldn't matter. You could still defend on the ground of your construction of how the two statutes fit together. Right? I suppose so. But, Your Honor, when a regulated entity goes and asks for permission from an agency to be able to build a pipeline, for example. But they can't — they have ways of giving permission, but saying their legal opinion isn't one of them. Suppose you went and asked the NLRB the same question. Right? You know, does the CSA allow us to do this? And the NLRB said, well, that's really not our problem. We don't have any authority over that. What difference would that — what authority does the agency have over that question? Under 21 U.S.C. 871b, Congress provided the Drug Enforcement Administration — provided it to the Attorney General who then delegated to the administrator of DEA authority to make rules, regulations, and procedures. That's the second request. But the first request was just tell us it's okay. That's the one to which we were asking about whether there's a filing decision. Can I see — can I see if I can frame the — I think the same question slightly differently, because I'm wrestling with this, too. You go to an agency and you say, we just want to know that you're not going to come after us if we do X. We think X is allowed by the statutes, but we want to know that you're not going to come after us if we do X, that you're going to — so can we essentially get, like, a legal opinion from you agreeing that we can do X? So you're not asking them to do a rule. You're not asking them to do anything sort of affirmatively. You're just really asking for their view of what the statute says. If they say to you, no, you can't do that, the statute does not allow it, one could argue that under Bennett, you're — they haven't decided any — there's no legal rights that flow from the agency's decision, because if the agency is right that the statute doesn't allow you to do it, if we agree with the agency that you can't do it, then it isn't the agency telling you their view of the statute that binds you, especially now that Chevron's gone. It's our view of what the statute says. And so, like, no — in theory, no legal rights flow from that. So why is that final agency action? And then let me just follow. If it's not final agency action, though, it creates this really weird deal where when you ask for that — and I can understand practically why you're asking for it. I totally get that. Your other option is to go and just issue prescriptions or whatever for this, which you can't even do because you can't get the message. But if you were to — if the agency correctly says you can't do it, then in theory there would be no final agency action under this way of reasoning, and you would not be able to challenge it. And so we would dismiss your petition, right? I guess we'd argue. But if the agency was wrong, if we conclude the agency was wrong, then there was final agency action because the agency is blocking you from doing something that the statute allows you to do. And so there would be jurisdiction. So it would be a weird deal where there's no jurisdiction if the answer was the agency was correct in saying you couldn't do it. There would be jurisdiction, but maybe that's okay because I'm not sure maybe it doesn't change the outcome. Maybe it doesn't matter because either way, you win in one instance and you lose in the other instance. It's just whether we deny the petition or whether we dismiss the petition. So are you following the sort of challenge? Absolutely. If I could back up just a little bit. If you put yourself in my client's position, right? We cast our eyes across DEA precedent. DEA has allowed and facilitated a number of requests, sua sponte, sometimes at the request of industries. So in the reverse distributor context, for example, that was a request from the industry. The industry didn't say promulgate regulations. They didn't propose regulations. They just said, hey, we would like to be, you know, sort of accommodated within the actual formal. Well, we'll talk about that in a minute. Go ahead. Sure. Thank you, Your Honor. So there were many different ways, many different tools. They used memoranda of understanding. They sometimes used those memoranda of understanding to actually grant registrations. Sometimes they passed regulations. There were a variety of ways. Sometimes there were individualized exceptions, as in the single patient IND with Robert Randall. All of these are detailed, and they're different. You know, and there's, as the Court's aware, there's a certain authority for doing it. So it's one thing if it says we have a statute that allows us to grant exceptions and we're doing that here. Then there's a final agency action. But if it's just a mere interpretation of the statute and saying we don't have, we just don't think we have the authority to do this, what do we do with that? Because in that instance, in theory, they're just saying even if there was no agency here, you couldn't do it, right? That's the core of the case, Your Honor. Because the core of the case is whether DEA has the tools to be able to accommodate this request at all. But they, in the end, they didn't say they didn't. They just said they wouldn't. But they said they wouldn't because the statute, because of the classification of psilocybin in Schedule I. No, but then when they got to the question of whether they were going to grant a waiver of registration, they said, they didn't say they couldn't. They just said they wouldn't. Well, they found, you're correct, Your Honor, they found that it was not in the public interest. And that was a finding after a decision-making process. But if you look at the reasons that they gave for that, the reasons were it's Schedule I. Here are the characteristics of a Schedule I substance, first of all. Second, there are research restrictions on Schedule I substances. That's just another statement of law. And third, to deviate in the way that you're proposing would be too dramatic a departure from current law. And fourthly, you never really said exactly what you want us to do. That particular piece, Your Honor, is a little bit confusing because we were under no obligation to say the scope of the rule that we wanted. And if you look at our letter to the agency, we said we're really open to a dialogue with you about how we might do this. And again, everything that we were saying was based on the agency's precedent. Can I say one other thing just about whether you really had a dilemma? I mean, the odd thing here is that you went to the agency and then came to us as a review of the agency decision as to that, as to the order. I mean, it seems to me what, in most instances, what litigants do in this context is you bring a district court case, and you say, you know, we need a clarification of whether we can do this because we intend to do it, and if we do do it, we could get prosecuted, and even if you got this letter and the agency's position is that we can't do it and we need a determination that we can, there are bazillions of lawsuits running around like that now, right? And so to do it as a review of an agency decision which isn't really a decision and come directly to us with no possibility of the development of a district court record and so on is an odd way to proceed. It may seem that way, Your Honor, but under this statute, 21 U.S.C.A. 77, the Congress routed these. Well, yes, if there's an agency decision, but that's why we're asking whether there is one. I think you should probably get off this question and go. Well, it's obviously a very important jurisdictional. Well, it's not because you still have your second part of the case, which is, you know, which definitely is a final agency decision. Yes, Your Honor. If I could say one more thing about it. In United States Fish and Wildlife Service v. Sierra Club, Inc., a 2021 United States Supreme Court decision that I don't have the cite for off the top of my head but I can get for you, the Supreme Court said that on Bennett's first prong, this consummation piece, if the agency itself says this is our final determination, this is the consummation of our process, well, of course the agency can't create the jurisdictional. But our concern with Bennett is really on their first prong. It's on the second one. Right. So if you go to the second prong, and I will move off of it after this. I just really want to, this is a very important point, I want to address the Court's question as best I can. So in this Court's cases, the Court has repeatedly recognized there's a case called Weight Watchers, Inc. v. FTC, which then cites another Ninth Circuit opinion called Clark v. Busey. And in both of those cases, the Court said that where an agency has a petition in effect and it denies that petition, unless there is some really good reason to think that Congress did not intend judicial review of that decision, we consider it final and we exercise judicial review. And if I could say one last thing about it, in the case that happened before this one where there was a petition to reschedule, the Court reviewed that decision. Of course, it didn't address final agency action, but it was a similar thing. We petitioned the agency and, you know, we got a final. Well, the second one where you're, as to the second issue where you petitioned the agency to do something, you don't have this problem. But as to the first one where you didn't petition to do anything, you just said, you know, tell us it's okay, you know, tell us your legal opinion that it's okay. But really, I think you should get off this. Okay. I will follow your instructions. So on the, just moving to the merits, Your Honor, I would like to make two points. And those, they're very simple. This case allows, the Court can rule for petitioners on very narrow grounds. There's nothing dramatic here or that requires the Court to go break new ground. Because really what we're faced with is a categorical view of the world from the DEA. And that categorical view of the world, that there is no path to access to Schedule I substances for therapeutic use. The only way that you can access them is through these research protocols. That view of the world stands in stark contrast to decades of agency precedent that we pointed out. And it also flies in the face of the statute, which is a deregulatory measure designed to remove the FDA from between the patient-doctor relationship in these very limited circumstances. Has the DEA ever approved the use of a Schedule I drug outside the research context? Yes, Your Honor, it has. So we cite in the reply note, I'm sorry, in the opening brief where we're talking about the Robert Randall episode or however you want to refer to it. We included in our, in the record, a hearing where Mr. Randall, you know, testifies that, you know, there was a settlement between himself and the government where the government agreed to allow him to have access to Schedule I marijuana for medical purposes. And it was to be given to him by his own treating physician, not in a research protocol. And so that is one example. And then there are other, the agency's account is they tried this for a while and it didn't work and they decided not to do it anymore. That is what the government's counsel in this case says. That's not what DEA said. DEA didn't address any of these historical examples except for the Epidiolex one. And it's important in the Epidiolex example as well just to touch on that. They cite the testimony of a DEA official in a congressional hearing. And if you read that testimony, you'll see that that official is saying that DEA supports therapeutic use outside of the clinical trial context in the expanded access context. And that was a Schedule I marijuana-related substance there as well. It's not the expanded access. It's an FDA. That's right. And it's the exact same thing. So DEA is saying, and this is important to understand in this case, they're saying, listen, you can do it in expanded access if you label it research, even though we all know that it's therapeutic and we all acknowledge that, right? But if you don't label it research, then you can't do it. The problem with that is that the point of the Right to Try Act itself was to distinguish it from expanded access by removing FDA. But the Right to Try Act has in it a designation of which provisions are being accepted. And the CSA is not one of them. That's right, Your Honor. The CSA doesn't need to. So where do you get the notion that the Right to Try Act was overriding the CSA or had to be accommodated by the CSA? I mean, at this stage of the argument, it's not really an override. It should be accommodating. But where do you get that from? So two places, Your Honor. First, we're not saying that the Right to Try Act overrides the Controlled Substances Act in any way. We're any more than RFRA has a provision that says this overrides the controlled substance. But RFRA does not have a provision that, as I understand it, says it overrides any other statute. Well, to the extent that I'm wrong about that, and I admit I'm not a RFRA expert and I trust— You are wrong. RFRA is a funny statute. It's an unusual statute that way. I trust you, Your Honor. So my second reason is that Congress actually for, you know, in many cases we find that Congress hasn't spoken quite as clearly as we would like in many situations. But here, in the very early stages, when it first enacted the CSA, in Section 902, it created a rule of construction precisely for this situation, where you have the interplay between the Controlled Substances Act on the one hand and a provision of the Federal Food, Drug, and Cosmetic Act on the other. And it said where there is some sort of a interaction between them, DEA and courts may not construe the provisions of the Controlled Substances Act to modify— But then you run into the same problem, which is that the RTT doesn't say you can do this despite the CSA, so there is no conflict. Respectfully, Your Honor, I think there is, because Congress defined eligible investigational drugs broadly, and then it — well, actually quite narrowly, and then it made a bunch of rifle-shot exceptions. It did not list Schedule I drugs. And when you view that in light of the savings clause in Section 902, it's — we have to assume that Congress was acting and drafting the right to try— But it seems to me that your stronger piece here is the question of whether the agency sufficiently explained — it could accommodate if it wanted to. I mean, that's your ultimate position. It could make an accommodation. That's right. And whether it explained why it didn't adequately seems to me to be the strongest argument. I agree, Your Honor. And that's why my first point— Well, if you thought so, you might have gotten there faster. Well, my initial point was to say that you could rule in our favor on very narrow grounds, and those are the grounds. There simply is no adequate explanation because the agency didn't grapple with its own precedent. It didn't come to grips with the problems that we raised in the petition. It's precisely the same problem that we had with the rescheduling petition in the Agarwal case before. And this is a classic problem. This is black-letter administrative law. When an agency doesn't, you know, deal with its own precedent, when it doesn't, you know, actually acknowledge and clearly grapple with the problems raised by a petition, the court vacates and remands because the AP— was that the scope of the request was not entirely clear. How do you address that point of the agency decision? So the agency decision didn't tell us what was not clear. And if you look at the government's brief, the only thing that it tells us is that we didn't say whether it was Dr. Agarwal who wanted this waiver or the class of physicians who wanted it. Obviously, Dr. Agarwal is concerned about his patients and being able to do this himself primarily. Nonetheless, when you're requesting a waiver that has to be done by regulation, it's obviously a forward-looking, generally applicable pronouncement, which, by definition, would apply to other similarly situated— But that wasn't true in the Randall and marijuana situations. They did it one by one, as I understood it. That's right, which is why we requested— But that's why there's a difference. That's why— That's why they didn't know which one you were asking for. We asked for both, though, Your Honor. And this is why we asked the first thing first. We said, listen, you've done this in the Randall situation. You've done it through 822d. You've done it through MOUs. We don't care which tool you want to use. Congress gave you all these tools. We don't care which one you use. We're requesting that you find some way to accommodate this urgently needed access to a therapeutic drug that Congress said that we should have access to. And nobody's disputing that it's an eligible investigational drug. But once you say that Congress said we should have access to, you're kind of gaming the system, because their position is, and at least off the top, maybe you can persuade me otherwise. It doesn't appear that Congress did say that. But what you're really saying is that the general zeitgeist of the RTT sort of applies here, and you ought to accommodate it. May I respond? I see that I'm past my time. Yeah. Why don't you respond, and then we'll have you sit down. We'll put 3 minutes on the clock after that. But please go ahead and respond. Thank you, Your Honor. Respectfully, again, I don't think it's the general zeitgeist. Congress said what an eligible investigational drug is. Neither the government nor DEA disputes that if you look at that definition and you just do textualism like you do so well, there's no way to say that it doesn't cover psilocybin. This is not something that's ever been disputed in this case. And so the question is, does the Schedule I status itself somehow, is it a silent exception that Congress didn't write in? And we just know that basic tools of statutory construction dictate that that's not how statutory construction works, right? Like, there — if there's going to be an exception, Congress — Let me ask you something. Does your second request for an accommodation depend on agreeing with that, on the agency agreeing with that? No, Your Honor. No. It only requires the APA basics of adequate explanation under the APA. Thank you, Your Honor. Okay. Thank you, Mr. Pennington. Let's hear from the DEA. Good morning, and may it please the Court. Thomas Pullum for DEA. It seems like the Court was more interested in the second part of the request for a waiver of rulemaking, so I will start there. Well, you might give us your short answer to the final agency action question.  So the government's view was that this request, the second letter, differed from the first insofar as it asked for an authorization to do something, not merely guidance and — guidance or assistance. So it seems somewhat similar to a request for a permit or a license. So —  So you just wouldn't think of it as two different requests. You would think of it all as one request. No. I'm sorry. We thought of it as two different requests. The first was the request for an authorization under the Right to Try Act, which, in their view, displaced the registration requirement. But however you kind of look at this first request, we agree that the answer is controlled by the statute, and the agency adheres to the same view of the statute that it articulated in the last case. The agency's view was that, you know, this was final agency action when it denied the authorization, but — But does it make any difference what the agency thinks about that? Only, I think, on the first prong, but as Your Honor said, those aren't what you're focused at. But kind of however the court looks at it, we agree it's controlled by the statute. And if this means it's not final agency action, the government certainly has no objection and is happy to take the correction. I guess I'm — well, I don't know how you can — I like your view on it because it's jurisdictional, but I don't see how it's not final agency action under the second prong when they ask for authorization and your position is they don't have it. That does change their rights. They asked for an authorization. They didn't get it. And so whatever legal consequence that has, I'm not sure. But they believed it was important to ask and they were denied that. Well, and that was — that was why the government also thought this was final agency action. But as I said before, we think it's ultimately controlled by the statute, whether that means it's not a final agency action because it's just, you know, all the consequences flow from the CSA or whether it's a final agency action because it's a denial of an authorization under that statute, which doesn't exist, is basically what the agency said. Either way, we agree that it's controlled by the statute and have no objection to whichever ground the court decides. With respect to the second request for a denial of a rulemaking, this is subject to extremely limited review and given the utmost deference under the APA. All that an agency needs to do is offer a brief statement indicating that it recognized the problem that was being asked about and providing a description of why it declined to exercise its discretion to engage in a rulemaking. Now, just to begin, the agency could have granted some kind of waiver by rule here. I mean, if the agency had said, well, recognizing the concerns that underlie the RTT and the fact that this is a drug that is under investigation and has been, that we are willing to issue a rule providing for a waiver of registration, it could have done that. Is that right? Yes. The agency never said it lacked authority under the CSA under Section 822d to engage in a rulemaking. Sotomayor So that suggests that, if it could have done that, that some explanation, I mean, the explanation here, other than this thing about the scope, which you can address, was just in the words of the statute. It just said we don't think this is a Schedule I drug and we don't think this is in public health, and that's it. It didn't explain anything about whether accommodating the RTT's scheme, even though it wasn't directly applicable, was a good or a bad idea or why it wouldn't do it. Well, I think it did. The agency first noted the features of the substance in question, which is that it has no currently accepted medical use, high potential for abuse, and a lack of accepted safety for use. But those are all the statutory criteria for why it's in Schedule I to begin with. Well, that's right. And I think it's appropriate for the agency to consider how this request fits with the kind of statutory framework, both the reasons for classification and the kind of express restrictions that Congress placed on access to Schedule I substances with respect to dispensing to patients. So if I could just provide an example that I think highlights this. Another type of rulemaking, or I'm sorry, another one regulation that the agency has adopted through this process, this waiver process, was to allow for law enforcement officers to possess controlled substances in the course of their official duties. Now, because that situation doesn't involve giving this highly dangerous substance to a patient, it doesn't as directly implicate the reasons for Schedule I placement in the first place, and it doesn't kind of implicate the structure of 823F and the circumstances in which Congress has said that dispensing is consistent with the statute. So I think because this requested waiver, whatever its scope, which we should talk about, goes kind of directly to the reasons why the substance is classified as Schedule I and goes directly to the narrow exception of 823F. What about the marijuana comparison? Yeah, so what the agency said was that all of these examples were consistent with the 823 framework, under which the only time it's appropriate to dispense a substance to a patient is in the context of research. And the testimony of Mr. Randall, which the petitioners put in the excerpts of record, underscores how it's consistent with that framework. He mentioned several times how his doctors were licensed to evaluate marijuana's use. That's on ER 382. ER 384, he says his personal doctor became the second ophthalmologist licensed by FDA to evaluate marijuana's medical use in the treatment of glaucoma. And then on ER 388, he says my medical condition has been constantly monitored by FDA-licensed and approved investigators. So this happened kind of repeatedly. You're saying these were 823F researchers? Is that your position? So it's a little unclear. It certainly started that way. The program kind of, my understanding is the agency became concerned over how it was being implemented. But in any event, none of that is in the letter? No, but the general reason is, which is that the examples which are provided were consistent with the 823 framework. And you just said you don't actually know whether it was. The epiduralics one was those people were registered researchers, but you don't know about the marijuana one. The agency said, explained that all of the examples, it said the examples were consistent with the 823 framework. The only evidence that's in the record is consistent with the idea that this was initially provided during research. And then there is case law, which the court can see. We cited one of the cases in our brief, explaining that the agency discontinued this program because it was concerned that it wasn't being administered in a lawful manner. So I think this explanation, while it could have been longer and more detailed, does satisfy, does clear what this court has described as the low hurdle for providing a short explanation of why a rulemaking can be appropriately denied. And none of this, of course, undermines the agency's threshold ground for denying the request for rulemaking, which was that the petitioners didn't provide the text or even the scope of the regulation that they sought. Petitioners waived any challenge to this independent ground, and the court could dismiss the petition on that ground alone. And the argument they did raise, belatedly in their reply brief, was just that, well, there was no regulatory requirement for us to provide the text of the requested rule. Whether or not that was a requirement in a regulation does not resolve the question of whether this is a reasonable basis to deny the request for a rulemaking. And I think it's just kind of a common sense that if you ask an agency to waive a statutory requirement through a rulemaking, you should provide the agency with the scope of the waiver that you're requesting. They never argued that this wasn't a reasonable ground, and so that provides another basis for dismissing the petition. I'm happy to answer any other questions the Court has. Well, it does not appear there are any, Mr. Pullum. So, Judge Brewer's on. Judge Van Dyke, any further questions? I don't think so. I mean, I do find your statutory argument singularly unconvincing. I'm sorry. Which statutory argument? The main statutory argument that somehow there is no, that the CSA fits within the RTT scheme or that there's a conflict that should be resolved by the 902. I know you're very earnest about it and you keep repeating it, but I just don't see how it works. I'm sorry. Just to clarify. You don't understand that? You were arguing that somehow because of the 902, if I have the right number, principle of CSA provision about how you apply the CSA, that the RTT should essentially be accommodated within the CSA, but I just don't see how that works given the fact that we already went over this. I don't know. Well, just to be clear, I believe you might be referring to the Petitioner's statutory argument. The government's statutory argument is that Section 902 is a kind of standard savings clause that does nothing.     And I could just address one point on that. They said, well, it affects the operation of the Right to Try Act, and our view is that it doesn't because, as Your Honor pointed out, the Right to Try Act provides a very limited exemption from parts of the FDCA. Yes, you're right. So I don't have anything else. Let me ask you quickly before you sit down. What is the status of the other remand? There was a prior panel that sent back the question of the Schedule I versus Schedule II rescheduling request. Do you know the status of that in the agency? That's right. It's still before the agency. The agency is considering the petition. Is there an estimated timetable on that? I don't have an estimated timetable. I would just point out that, you know, the basis of the remand is that the agency had not needed to either provide a more detailed explanation or, you know, take a different disposition. So the agency is taking that very seriously and looking at everything to give its considered views. And there was also a kind of legal change in the interim that the agency needs to consider, which was that the Office of Legal Counsel issued an opinion that the DEA's prior test for evaluating a currently accepted medical use was too narrow. So this is something, you know, new since the remand that the agency also needs to take into account. Isn't there also or is there also a pending statute to include the CSA as an exception within the RTT? I don't know. If you're asking is there a bill pending in Congress, I'm just not aware. I apologize. I didn't see that referenced in the briefs and I'm not fully aware of everything that happens in Congress. It's not in the briefs, but I think there is one. I'm sorry. I just don't know. Okay. Thank you very much. We would ask that the petition be dismissed. Thank you. Thank you. Or denied. Just a couple of points briefly. The first one is this case is actually pretty simple. This is just like any case where a party is asking for an exemption from a regulation, asking for permission to take an action under the statute, and importantly, the actions that we were asking to take were ones that the DEA had permitted parties to do in the past. So it's not like these things were impossible to do. The question was did the agency want to exercise its discretion to do so? And the agency said no. On the point about the waiver of the 822D argument, throughout the record, both in this case and before, it has been extremely clear, and DEA has repeated it back to us in its letters every single time. The government repeats it in its brief. What Dr. Agarwal wants is to be able to provide this substance for therapeutic purposes to his patients. That is the request. As far as the scope of the particular provisions for abuse and diversion that he might, that DEA might think are necessary, obviously, Dr. Agarwal is a registered physician with DEA. So he doesn't, and he's not going to abuse or divert these drugs. He's going to use them in the course of his professional practice. But part of, I think, the agency, reading between the lines of the agency decision is that it's not clear from the letter whether you're asking for a Dr. Agarwal-only rule or you're asking for a rule that would be generally applicable to medical practitioners who wish to distribute either psilocybin or perhaps all Schedule I drugs. And then, if so, what would be the conditions on that? And I think that is what the agency likely means by scope of your request. It would have been great for them to have told us that, right, and to have spelled that out. But isn't it fairly clear? I mean, the letter does not indicate much beyond that your client would like to do this. On the first point about whether it's just him or a broader class, and, again, this was not in DEA's decision. But to address it, a rule is generally applicable. 822D allows the agency to make these waivers by rule to classes, and this is from the government's brief and from the plain text of the statute. There's no way that there could be a generally applicable rule that applies only to my client. So I think that that part is just by definition. But you've just said two contradictory things then. So it seems to me they have a legitimate problem. You said all Dr. Aguilar wants is to be able to prescribe for his patients, and then you said, but, of course, that's going to mean it's going to have to be applicable to everybody. Dr. Aguilar is knocking on every door. The house has a front door, a side door, a back door. He's trying to get through the door any way he can because he has patients who are able to give them an eligible investigational drug. Congress acted, President Trump signed this into law in 2018 to remove FDA from the process. And now DEA is inserting them back in. And one thing that's very important about this is to recognize that DEA would allow this under expanded access because there's a label on it that says research, right? But now the exact same thing that it's allowed from the dawn of the CSA forward consistently, it won't allow strictly because Dr. Aguilar won't lie about it and say that he wants to do research because he doesn't. There is no registration available under the regulations for this particular activity. So he asked them to do what they've done in the past, either create that through a regulation or grant him an exemption like you did in these other cases. We ask that the Court — But can I just for a moment ask you about — you keep relying on these reverse distributor situations. I don't — as I understand what the agency did with that is it basically said, well, you know, we just realized that this is really happening, and so we're going to make a regulation and we're going to — and it's in that context that they said that, as I understood what they were saying, was the opposite of — as to being not necessary to the distribution. They said, well, that used to be the case, but at this point it's become very prevalent, so we're going to make a specific exemption for these people. So I don't understand. You keep — in your briefs, you go on and on and on about that usage, and I don't see that they were actually allowing it earlier. It was happening a little. They weren't really noticing it. And once they noticed it, they passed a rule. The core issue with the reverse distributor and why I think it's so important is because DEA did not act through 822D at first. These folks were registered as distributors, okay? They were not registered as manufacturers. DEA knew they were manufacturing, but it didn't require registration. I thought they weren't manufacturing. They were. They were processing, and processing falls under the statute. That was why it was problematic. In the same way, Dr. Agarwal is registered with DEA to do a whole host of things. He's been under the regulations and abiding by them. Now he wants to do a different activity for which there is no registration classification. So it's kind of odd for him to have to ask for a waiver of a registration requirement that doesn't exist. He asked for it anyway to the extent that the agency thinks there is one that could apply. But the point is, in the past, when confronted with this situation where there's an activity that the DEA's regulations do not address, the agency has said, well, is it an essential link in the closed distribution system? No, I thought they said the opposite. They said, well, we thought it wasn't, but it now appears it is, so now we're going to have a regulation. You're right, Your Honor, but there were years. The first time that they promulgated a rule, that they put a proposed rule, was 1995. It was 2003 before they had a final rule. During all that time, they used memoranda of understanding to make distributors magically manufacturers. Why can't they do that to help these patients get this drug? Why can't they do that to facilitate Congress's will here? There's no explanation. They don't address it, and that's why we think it's important. Okay. I think we've let you go over your time. I want to thank you for your argument this morning, Mr. Pennington. I want to thank both you and Mr. Polam for the helpful briefing and argument. This case is submitted.
judges: BERZON, BRESS, VANDYKE